UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ADIL ALAGIC, )<br>)<br>Defendant. ) | Case No. 4:06CR00740 ERW(AGF) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant, Adil Alagic. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and a motion to suppress statements.[1] (Doc. Nos. 21 & 22). An evidentiary hearing was held on January 4, 2007. The government was represented by Assistant United States Attorney Thomas C. Albus. Defendant was present and represented by his attorney, Stephen H. Gilmore. At the hearing, the government presented the testimony of Deputy U.S. Marshal Luke Adler, who has been detached to the Joint Terrorism Task Force ("JTTF") since July 12, 2002, and of Detective William McDonough, a detective with the St. Louis Metropolitan Police Department ("SLMPD"), who has been detached to the JTTF since its inception in October, 2001. The witnesses were cross-examined extensively by defense counsel. The

---

[1] Defendant also filed a motion for a bill of particulars (Doc. #20), but Defendant withdrew that motion at the evidentiary hearing based on the government's commitment to disclose the identity of "A.R.," who is referenced in the indictment.

parties were given leave to file post-hearing memoranda, after which the matter was taken under submission. Trial is scheduled for Tuesday, February 20, 2007.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In June 2002, members of the JTTF were involved in an investigation related to the business activities of Defendant Adil Alajic. On June 13, 2002, Sergeant Donald L. Thompson, a Sergeant with the Missouri Highway Patrol assigned to the JTTF, applied for a federal search warrant for Defendant's residence at 4955 Lindenwood, Apartment 1E, St. Louis Missouri, including the common basement, the garage and the enclosed walkway connecting the building to the garage. Govt. Ex. 1.

The ten-page affidavit, filed in support of the search warrant, is summarized as follows. Members of the JTTF and other law enforcement officers were investigating Defendant Alagic, certain of his associates, and one of his family members, in connection with two driving schools operated by Defendant: Zucco Truck Driving School ("Zucco") and Adil Alagic Driving School ("AADS"). The investigation had produced evidence that Defendant had arranged for Missouri drivers' licenses and related permits, certifications, or authorizations to be issued, fraudulently, to clients of his schools who otherwise failed to meet the requirements for such issuance. Defendant obtained such Missouri Department of Revenue documents by paying bribes and gratuities to Missouri

driver's license examiners.

The investigation showed that Defendant is a Bosnian refugee who operated Zucco and AADS primarily out of his residence, and that his main clientele consisted of other Bosnian refugees and immigrants, many of whom spoke little or no English. According to multiple confidential informants who had separately provided information in the months prior to the application, Defendant and his associates would agree with such Bosnian clients to obtain the licenses or authorizations sought by them, often charging as much as $1,000, without the clients having to take the tests or complete the forms which would otherwise be required by the state. Participant witnesses revealed in interviews that Defendant commonly paid Missouri driver's license examiners bribes or gratuities to "pass" applicants who had not taken or passed tests, and that Defendant also bought lunches for individual examiners or employees of the examiners' offices.

Two driver's examiners employed by the Missouri State Highway Patrol admitted to the investigators they had repeatedly accepted cash, described as "gratuities" or "tips," directly from Defendant or his son, Amir, during the two year period prior to the search warrant application. Other benefits provided by Defendant included food, gifts, the sale of a car at below market value, and free repair work on that car. The services provided by the examiners to Defendant's clients included completing forms as if the applicants had taken the drivers' examinations, when in fact they had not. A third person, who had been a driver's examiner until April 2002, admitted that he had taken perhaps $25,000 from Defendant for facilitation of the issuance of fraudulent drivers' licenses, including

Class F and commercial drivers' licenses. This former examiner would provide blank forms to Defendant, and receive cash in exchange. One recipient of a fraudulently obtained license advised the investigators that Defendant charged $1,000 for such fraudulently-obtained licenses, and that when full payment was not made, Defendant threatened to kill the debtor.

The investigators had examined Defendant's federal tax filings for the years 1998-2001, which showed minimal amounts of income, little of which was attributable to Defendant's businesses, and none of which was attributable to Defendant's rental property. The returns did not reflect as expenses the payments, gratuities or meals given to license examiners. The investigation also showed that Defendant had extensively remodeled the common basement of the Lindenwood residence, at a cost – as stated by Defendant to one informant – of approximately $60,000. He also operated a Mercedes SUV. Based on the experience of the affiant and other investigators, Defendant's reported income was insufficient to meet Defendant's living expenses, the remodeling, the thousands of dollars of expenditures paid to license examiners, and other expenses uncovered. Based on their collective experience, the investigators also knew that cash proceeds from such an illegal enterprise, and other assets purchased from such proceeds, are most commonly kept within the perpetrator's residence or primary place of business, which in this case was also the target residence. A few weeks prior to the search warrant application, a SLMPD officer had been inside Defendant's apartment to investigate an alleged threat by Defendant, and had observed both a computer and a book with

4

handwritten entries, that the affiant believed likely listed clients and contact information.

The affidavit further recited that Defendant had recently become aware of the interest by investigators in his business, and had broadcast on a Bosnian radio program a request that those whom he had aided in acquiring licenses contact him. The timing and content of the appeal suggested that Defendant was seeking to influence persons with knowledge of his scheme to withhold the truth from investigators. The affidavit also set forth details regarding computer hardware and software, including storage capabilities and requirements pertaining to retrieval. It further recited that the investigators would not access stored electronic communications covered by 18 U.S.C. § 2701, et seq., or documents protected by the Privacy Protection Act.

The warrant requested that the premises be searched for certain categories of documents, including documents reflecting contact information related to those who received licenses or permits; accounts payable and receivable information and other financial information; lists of clients and customers of the driving schools; corporate documents regarding the driving school; and identification documents, Department of Revenue or other license-related forms. It also requested a search for currency. Based on the affidavit, a federal search warrant was issued on June 13, 2002, at 2:12 p.m., by Magistrate Judge Terry I. Adelman.

Following the issuance of the search warrant, Detective Scott McKelvey, who was employed by the SLMPD, contacted Defendant Alagic and said they needed to speak with him. Det. McKelvey had known Defendant prior to this time and had his telephone

5

number. Defendant said he was conducting a driving test, and asked the investigators to meet him at the coffee shop on Gravois that Defendant then owned and operated. Detectives McDonough, McKelvey and Steve Gori went to Defendant's coffee shop, where they were met by Defendant and his son. The detectives were in plain clothes and were driving an unmarked car. Defendant had had prior dealings with the detectives, which prior contacts were not otherwise identified at the hearing, and already knew from his prior contacts that they were police officers. For reasons of privacy, the detectives asked to speak to Defendant outside. They advised Defendant that they had a search warrant for his residence, and asked if he would accompany them back to his residence. Defendant agreed, but said he needed to get someone to cover the coffee shop for him.

The conversation between Defendant and the detectives was conducted in English. During their communication, Det. McDonough did not perceive there was any language barrier and Defendant appeared to understand everything that was said. Defendant did not appear to be under the influence of any drugs or alcohol.

After Defendant made the necessary arrangements to cover his coffee shop, they drove to the Lindenwood residence. The detectives went in one car, and Defendant and his son drove in their own vehicle. When Defendant and the detectives arrived, the execution of the search warrant was in the beginning stages, the executing officers having been allowed entry by Defendant's wife. As they stood outside the residence, Defendant volunteered that he had a large sum of money in a jacket that was in the closet. This statement was not in response to any questions by the detectives. During the course of

6

their search, the officers in fact found $13,000 in the pocket of a jacket that was in the closet, which amount was seized. Defendant's computer and other documents were also apparently seized.

The detectives wanted to interview Defendant, and asked if he would come to police headquarters for an interview. Defendant agreed, and he and his son drove their own car from the residence to police headquarters at 1200 Clark. The detectives waited for Defendant and his son to park their car, and then met them inside the lobby, after which the detectives took them to the intelligence office on the fourth floor. Neither Defendant nor his son were placed in handcuffs or restrained in any fashion.

The three detectives took Defendant and his son to a vacant office which contained a desk and a few chairs, and they brought in additional chairs. Defendant and his son sat next to each other at the desk, and the two detectives conducting the interview sat on either side. All three detectives were not in the room continuously, as one or two of the detectives might come and go, but at most times during the interview there were at least two detectives present. Defendant and his son were not restrained, and none of the detectives had their firearms displayed.

At the start of the interview, Det. McDonough advised Defendant and his son, jointly, of their rights under Miranda by reading those rights to them from a card that he keeps with him. He advised them as follows:

> You have the right to remain silent. Do you understand this right?
> Secondly, anything you say can and will be used against you in court. Do you understand this right?

> You have the right to a lawyer and to have him present with you while you are being questioned. Do you understand this right?
> If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you so desire. Do you understand this right?

After he read each right, Det. McDonough asked Defendant and his son, individually, whether each understood that right. After hearing each right, Defendant indicated that he understood, and Defendant waived his rights, indicating that he wished to speak to the detectives. With Det. McDonough and Det. McKelvey serving as the main examiners, they interviewed Defendant and his son, together, for 45 minutes to one hour. During the course of the interview, Defendant and his son were never advised that they were not free to leave. Although Det. McDonough believed that at the start of the interview some of Defendant's answers were not truthful, he believed Defendant became more truthful as the interview progressed.

Both the advice of rights and the interview were conducted in English, without the assistance of an interpreter. Det. McDonough had spoken to Defendant before, and though he knew Defendant was a Bosnian refugee, he had never needed an interpreter to communicate with him previously, and he did not perceive the need for an interpreter during the June 13 interview. Defendant appeared to understand what was being said, and his answers were responsive to their questions. Defendant never indicated that he did not understand the questions asked of him. Defendant may possibly have asked that a question be repeated, in which case, the detectives repeated the question. No threats or promises were made to induce Defendant's statements.

The detectives did not ask Defendant or his son to give a written statement. When the oral interview was completed, the detectives did not place Defendant or his son under arrest, and Defendant left the headquarters building with his son and drove away in his own car.

## CONCLUSIONS OF LAW

### A. Adequacy of the Search Warrant

At the hearing, Defendant advised the Court that his motion to suppress evidence was limited to two grounds: (I) that there is no probable cause for the search warrant; and (ii) that the items to be seized were not adequately described. He does not challenges the execution of the warrant itself or contend that the items seized were outside the scope of the warrant.

To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched. Warden v. Hayden, 387 U.S. 294, 306-7 (1967); Johnson v. United States, 333 U.S. 10 (1948); Rule 41, Federal Rules of Criminal Procedure. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338

U.S. 160, 176 (1949). Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a grudging, hyper-technical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Probable cause may be found in hearsay statements from reliable persons, Gates, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, Draper v. United States, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948); United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003), cert. denied, 541 U.S. 1081 (2004). While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive. Information contained in applications and affidavits for search warrants must be examined in light of the totality of the circumstances presented. Gates, 462 U.S. at 230. Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding. Id. at 236.

As set forth in the affidavit, here the investigators had received information from multiple confidential informants that Defendant was charging his clients as much as $1,000 to provide them with licenses and other similar documents, without their having to meet the requirements for those licenses. One such client advised them that he had paid $1,000 for such a license. Participant witnesses, including one former and two current

10

license examiners, confirmed that they had received payments, favors or other gratuities from Defendant in exchange for providing the necessary documents. Defendant's fraudulent conduct was further corroborated by the investigators' examination of Defendant's tax records, which showed that neither the income nor the expenses related to these payments were reflected on Defendant's federal income tax returns. Defendant also appeared to have incurred expenses that exceeded his joint reported income.

There was also reason to believe that evidence related to this scheme was likely to be found inside Defendant's residence, as Defendant operated his two driving businesses primarily from his residence, and a police officer who had been inside the residence within weeks of the issuance of the warrant had observed a computer and a book with handwritten entries, that appeared to contain client and contact information. Based on the collective experience of the trained investigators, they knew that individuals engaged in such cash-based fraudulent schemes often kept both cash and the proceeds of the schemes in their residences or principal business offices, which here was the residence as well, and that there were likely to be documents related to the scheme located there as well.

From a review of the affidavit, the Court finds that there is ample probable cause to support the warrant. See United States v. Underwood, 364 F.3d 956, 963 (8th Cir. 2004) (information from reliable informant and corroborated by independent officer investigation sufficient for probable cause), vacated and remanded on *Booker* grounds, 125 S.Ct. 1037 (2005); United States v. Gabrio, 295 F.3d 880, 882 (8th Cir. 2002) (probable cause found based on firsthand information of reliable informant); United

States v. Pennington, 287 F.3d 739, 742-43 (8th Cir. 2002). Even if there was some question regarding the probable cause or the degree of detail provided – and there is not – the officers relied, in good faith, on the warrant. United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001).

Defendant further challenges the particularity of the warrant, asserting that the items to be seized are not adequately described. The Fourth Amendment requires that a search warrant describe with particularity the place to be searched and the items to be seized. United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999); FED. R. CRIM. P. Rule 41(c)(1). This requirement "prevents the seizure of one thing under a warrant describing another," and protects against "'general, exploratory rummaging in a person's belongings.'" Andresen v. Maryland, 427 U.S. 463, 480 (1976) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).

However, Defendant did not suggest, either at the hearing or in his post-hearing memorandum, in what manner he believes particularity is lacking, and the Court finds no such deficiency. The warrant lists a few categories of documents and things to be seized in a sufficient amount of detail. United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001) (particularity requirement satisfied where items included documents, weapons, and personal phone/address books related to drug activities). Indeed, where, as here, a complex and pervasive business scheme is alleged, the courts have authorized the seizure of broad categories of documents. See Andresen, 427 U.S. at 480 n.10 (finding warrant authorizing seizure of long list of general business records sufficiently particular, noting

12

that the complex nature of real estate scheme must allow some generality of description and the collection of "many pieces of evidence that, taken singly, would show comparatively little"); United States v. Mathison, 157 F.3d 541, 549 (8th Cir. 1998) (upholding sufficiency of broadly worded search warrant seeking financial records where it was limited to records pertaining to 17 businesses and 11 individuals implicated by investigation); United States v. Kail, 804 F.2d 441, 445 (8th Cir. 1986) (finding warrant authorizing seizure of five categories of records covering most business documents sufficiently particular where there was probable cause to believe business was permeated by fraud); see also, United States v. $92,422.57, 307 F.3d 137, 148-50 (3d Cir. 2002) (holding that warrant authorizing seizure of computers, instruction manuals, and all business records covering 9 year period sufficiently particular because the seizure of records only of illegal transactions would not be sufficient to prove no legitimate sales occurred).

In any event, even if some portion of the search warrant were deemed to be overbroad, suppression would be limited only to those items seized pursuant to the overbroad portions of the warrant. See United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir. 1983) (en banc) (holding that despite seizure of firearms pursuant to invalid portion of warrant, evidence of participation in drug conspiracy admissible in accordance with sufficiently particularized portions of warrant); accord, United States v. Timley, 443 F.3d 615, 622 (8th Cir.) (holding that where warrant is invalid only in part, warrant is "severable," and items seized pursuant to valid portions need not be suppressed), cert.

denied, 127 S.Ct. 299 (2006); United States v. Krasaway, 881 F.2d 550, 553 (8th Cir. 1989) (same). Here, Defendant has not identified any items seized pursuant to allegedly overbroad portions of the warrant. Indeed, the only item seized that was specifically identified at the hearing, was the $13,000 in currency, and currency was specifically listed in the warrant.

### B. Voluntariness of Statement

Defendant also seeks to suppress his statements, asserting that the interrogation was custodial and that Defendant did not understand English well enough to provide a valid waiver. A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412, 423-24 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503, 513 (1963). "The requirement that Miranda

warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); see also Dickerson, 530 U.S. at 444.

Although the parties have focused primarily on the statements made by Defendant at police headquarters, Defendant also made a statement to the detectives when he first arrived at the residence, advising them that currency could be found in a jacket in the closet. Defendant made this statement prior to being advised of his Miranda rights. Although Defendant does not make any express challenge to this statement, the Court finds it should not be suppressed for two reasons. First, Defendant was not in custody at the time of the statement. The officers advised him of the search warrant and asked him to return to the residence with them, but he was not required to do so. Defendant agreed, and he and his son drove to the residence in their own vehicle. Defendant was not restrained in any fashion at the time he made this statement. Second, Defendant's statement was not the result of interrogation, but rather, was volunteered by him. As such, it is not subject to suppression. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); United States v. Henderson, 770 F.2d 724, 728 (8th Cir. 1985) (discussion in nature of conversation "normally attendant to arrest and custody," not interrogation) (quoting Innis, 466 U.S. at 300-01).

15

Nor are the statements made by Defendant at police headquarters subject to suppression. <u>Miranda</u> warnings are required only if a defendant is placed "in custody" and then interrogated. <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 321-22 (1994); <u>Miranda</u>, 384 U.S. at 478-79. A suspect is considered in custody under <u>Miranda</u> either when he has been formally arrested and is not free to leave the location or when a reasonable person in the suspect's position would have "considered his freedom of movement restrained to a degree that is usually associated with a formal arrest." <u>United States v. Caldwell</u>, 954 F.2d 496, 499 (8th Cir. 1992) (citing <u>Berkemer</u>, 468 U.S. at 440). Incarceration itself does not automatically render a statement involuntary. <u>See</u> <u>Flittie v. Solem</u>, 775 F.2d 933, 944 (8th Cir. 1985) (<u>en</u> <u>banc</u>). Additionally, "[w]arnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" <u>Jenner v. Smith</u>, 982 F.2d 329, 335 (8th Cir. 1993) (<u>quoting</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). Instead, a determination whether a suspect is "in custody" focuses on the totality of the circumstances. <u>Id.</u> In <u>United States v. Griffin</u>, 922 F.2d 1343 (8th Cir. 1990), the Eighth Circuit delineated six "common indicia of custody" to be considered when determining whether a suspect is in custody while being questioned:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during

16

> questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349. "The first three of these factors tend to mitigate against a finding of custody. The last three factors tend to weigh in favor of a finding of custody. A finding of custody does not, however, have to be supported by all six factors." United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996) (interim citations omitted), overruled on other grounds, United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004). A particularly strong showing on one factor may compensate for a weak showing on other factors. See Griffin, 922 F.2d at 1349; accord United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991) (five of the six Griffin factors supported finding that defendant who was questioned at the FBI headquarters was not "in custody"). The determination, based on the above factors, is an objective one, which does not turn on "the subjective views harbored by either the interrogating officers or the person being questioned." Thatsaphone v. Weber, 137 F.3d 1041, 1045 (8th Cir. 1997) (emphasis in opinion) (quoting Stansbury, 511 U.S. at 323).

Based on these facts, the Court finds that Defendant was not in custody at the time of his interview. Defendant was asked to go to police headquarters, and he agreed and drove there in his own car. He was not restrained, was never advised he was not free to leave, and there is no evidence that any strong-arm tactics or deception were used. While the interview was conducted at police headquarters, Defendant was simply sitting at a desk in an office, and he had his son seated next to him the entire time. The interview lasted no more than one hour, and at the end Defendant was not arrested, but rather drove

home in his own car. On these facts, there is nothing to indicate that it was "police dominated." United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985). As such, the interrogation was not a custodial one requiring Miranda warnings. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (recognizing that suspect is not in custody simply because questioning took place at police station, and holding that Miranda warnings were not required when Defendant voluntarily accompanied police to station, talked to police for 30 minutes, and was permitted to leave); United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (Miranda warning not required because defendant voluntarily went to police station upon request, was told he would not be arrested that day, was not interviewed in holding cell area, and was not arrested at conclusion of ninety-eight minute interview).

In any event, Defendant was orally advised of his Miranda rights prior to any questioning at police headquarters, and he acknowledged understanding those rights. Although Defendant asserts that he did not have a sufficient command of the English language to understand and voluntarily waive his rights, the record does not support this assertion, and the Court finds, as a factual matter, that Defendant in fact understood what was said to him in English. The detectives who interviewed Defendant and advised him of his rights had had prior dealings with Defendant, in English, and based upon those dealings had no reason to believe that Defendant needed an interpreter. Prior to the start of the interview, Defendant acknowledged that he understood each of the rights of which he was advised, never suggesting any inability to understand what was being said.

Thereafter he gave answers, in English, that were responsive to the detectives' questions, again never suggesting during the course of the interview that he did not understand their questions. As such, based on the totality of the circumstances, the Court finds that the detectives adequately advised Defendant of his Miranda rights, and that Defendant knowingly and voluntarily waived his rights prior to making any statements. See United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997) (waiver by French-Canadian suspect valid where he understood basic English, was read warnings line by line, and indicated he understood).

Nor is there any evidence that Defendant's statements were otherwise involuntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc), cert. denied, 543 U.S. 1145 (2005). In determining voluntariness, the court examines the totality of the circumstances. Id. Relevant factors include the length of the detention, the repetitive and prolonged nature of questioning, the accused's age, and the questioning tactics. Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001).

Here, there is nothing to suggest that Defendant's will was overborne. At most there were only two or three detectives in the room, Defendant was there with his son, and neither were restrained in any fashion. Defendant, who was born on November 29, 1958, was 43 years old at the time of these events, and had operated two driving-related businesses and a coffee shop. He did not appear to be under the influence of any drugs or

19

alcohol, or to be impaired in any other manner, and there is no evidence that any promises or threats were made to induce Defendant's waiver or his oral statements. Although the specific statements made by Defendant during this interview were not identified, it appears he was cooperative and became more truthful as the discussion progressed. Based on the circumstances as a whole, the Court finds that Defendant knowingly and voluntarily waived his rights, and thereafter made a voluntary statement to the detectives.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. #21] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. #22] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 12th day of January, 2007.